MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York  10281
(212) 336-0077 (Gizzi)

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | 06 Civ. \_\_\_\_ (  ) |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | COMPLAINT |
| HOWARD R. BAER and | : | |
| KEVIN C. BAER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

The plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Howard R. Baer ("Howard Baer") and Kevin C. Baer ("Kevin Baer"):

**PRELIMINARY STATEMENT**

1.      Howard Baer and his son, Kevin Baer, participated in a fraudulent scheme to

manipulate the stock of Health Enhancement Products, Inc. ("HEPI"), a start-up nutraceutical

company.

2.      In the fall of 2003, Howard Baer, a recidivist securities law violator, obtained

control over a majority of HEPI's common stock, and became the Chief Executive Officer

("CEO") of HEPI.  Howard Baer, with the assistance of Kevin Baer, HEPI's executive vice-

president, then disseminated materially misleading information about HEPI and the company's primary product, ProAlgaZyme, a purported natural dietary supplement, in press releases and the company's annual, quarterly, and current public filings. HEPI claimed that ProAlgaZyme was a potential cure-all for numerous diseases and illnesses. For instance, in a January 20, 2004 press release, HEPI announced that the biochemistry department of Arizona State University ("ASU") had conducted an independent study that "concluded that . . ProAlgaZyme . . . possesses fibrinolytic properties, required in the breakdown of pathological fibrin gel, thus decreasing the risk of a stroke or heart attack." Further, the press release quoted Howard Baer as saying that "[t]he study provides conclusive evidence of the efficacy of ProAlgaZyme." These representations were false. In fact, the ASU scientists did not conclude that ProAlgaZyme reduced the risk of a stroke or heart attack.

3.    While HEPI was issuing these misleading press releases, Howard Baer executed numerous trades in the company's stock to ensure that the price and trading volume increased. In fact, HEPI's stock price increased from approximately $0.01 per share in October 2003 to $7.54 per share in February 2004.

4.    Howard Baer profited from his fraudulent conduct. During the relevant period, Howard Baer sold over 390,000 shares of HEPI stock, primarily in an account in his wife's name, for proceeds of more than $1,349,000.

## VIOLATIONS OF FEDERAL SECURITIES LAWS

5.    Howard Baer, directly or indirectly, singly or in concert, has engaged in transactions, acts, practices, or courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b-5 and 13a-14, 17

C.F.R. §§ 240.10b-5 and 240.13a-14.  Howard Baer has also engaged in acts, practices, or courses of business that have aided and abetted violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13.

6.      Kevin Baer has engaged in acts, practices, or courses of business that have aided and abetted violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1).  The Commission seeks a permanent injunction to restrain and enjoin Howard Baer and Kevin Baer from engaging in the transactions, acts, practices, and courses of business alleged herein.  The Commission seeks a judgment ordering Howard Baer to disgorge his ill-gotten gains and to pay prejudgment interest thereon.  The Commission seeks the imposition of civil money penalties against Howard Baer and Kevin Baer pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).  The Commission seeks an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting Howard Baer and Kevin Baer from serving as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).  The Commission also seeks an order enjoining Howard Baer from participating in the offering of a penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and

Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6). Finally, the Commission seeks all other just and appropriate relief.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a), and Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa.

9.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the transactions, acts, practices, and courses of business alleged herein occurred within the District of Arizona. For instance, HEPI maintained its principal place of business in Tempe, Arizona, and Howard Baer and Kevin Baer engaged in the conduct alleged herein while working at HEPI's Tempe office.

10.     Howard Baer and Kevin Baer, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS AND RELEVANT ENTITY

### Defendants

11.     **Howard Baer**, age 63, is a resident of Scottsdale, Arizona. Since the fall of 2003, Howard Baer has served as HEPI's Chairman of the Board of Directors and sole director, as well as the company's CEO, Secretary, and Treasurer. Howard Baer is a recidivist securities law violator. In 1994, a United States District Court entered a final judgment permanently enjoining Howard Baer from future violations of Section 10(b) of the Exchange Act and Rule 10b-5

thereunder.  SEC v. Baer, Civil Action No. 93-5159 (JFK) (S.D.N.Y.).  In that action, the Commission's complaint alleged that Howard Baer engaged in a free-riding scheme in which he placed orders to purchase stock through numerous broker-dealers without the intent or ability to pay for the purchases.  The final judgment ordered Howard Baer to pay disgorgement of $3,210,013 plus prejudgment interest of $152,041, and imposed a civil money penalty of $100,000.

12.     **Kevin Baer**, age 38, is a resident of Tempe, Arizona.  From the fall of 2003 through the summer of 2005, Kevin Baer was an officer of HEPI.  Specifically, he served as an executive vice-president of HEPI in charge of the development and marketing of ProAlgaZyme.

### Relevant Entity

13.     **HEPI** is a Nevada corporation.  HEPI maintains its principal place of business in Tempe, Arizona.  HEPI common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act, and is quoted on the Over-The-Counter Bulletin Board.  HEPI has described itself as a "fast growing nutraceutical company" that is "directed specifically at the development and marketing of supplementary health-enhancing products using only pure, all-natural and herbal extracts."  HEPI's primary product is ProAlgaZyme, which purportedly is "an immune system enhancing water that is produced from an algae grown in 100% distilled water."  According to HEPI's periodic filings with the Commission, from 2003 through 2005, HEPI has generated less than $200,000 in revenue, primarily from sales of ProAlgaZyme.  HEPI incurred net losses of approximately $568,000 in 2003; $3.8 million in 2004; and $5.9 million in 2005.

## FACTS

### Howard Baer Acquired Control of HEPI

14.     In the fall of 2003, Howard Baer acquired Health Enhancement Corporation, a private company that purportedly owned the material necessary to manufacture ProAlgaZyme.

15.     Howard Baer then sought to acquire a public shell company to merge with Health Enhancement Corporation in order to access the public securities markets.

16.     Howard Baer learned of a public shell company named Western Glory Hole, Inc., which had no assets or liabilities, and he negotiated a transaction through which Western Glory Hole acquired Health Enhancement Corporation.

17.     After the acquisition, the name of the company was changed to Health Enhancement Products, Inc.

18.     As of December 31, 2003, there were more than 10,000,000 shares of HEPI common stock issued and outstanding, including 9,000,000 shares issued to Health Enhancement Corporation shareholders in a one-for-one share exchange.

19.     As of December 31, 2003, Howard Baer owned or controlled over 6,500,000 shares of HEPI stock.

20.     After becoming the majority shareholder, Howard Baer became HEPI's CEO.

### Howard Baer Directed an Effort to
### Increase the Price of HEPI Common Stock

21.     After obtaining control of HEPI, Howard Baer orchestrated a scheme to increase the price and trading volume of HEPI stock.

22.     Beginning in late 2003, Howard Baer directed HEPI to disseminate press releases and file periodic reports with materially misleading information about ProAlgaZyme, as well as HEPI's business prospects.

23.     While HEPI was issuing these misleading public statements, Howard Baer
(primarily through a brokerage account in his wife's name) executed numerous trades in HEPI
stock in order to inflate artificially the price and trading volume of HEPI stock.

**Howard Baer Directed HEPI to Issue Misleading Press
Releases and to File Misleading Periodic Reports with the Commission**

24.     Beginning on October 30, 2003, HEPI made materially misleading public
statements in press releases and public filings.

*HEPI Falsely Announced that It had
Conducted "Clinical Trials" on ProAlgaZyme*

25.     HEPI falsely indicated that it was conducting "clinical trials" on ProAlgaZyme.
Specifically, HEPI disseminated a press release on October 30, 2003 that stated:

> Recent clinical trials performed by the company have indicated that ProAlgaZyme
> may increase and activate the white blood cells in individuals whose white cells
> are low or inactive, in effect enhancing the immune system. Heath Enhancements
> is currently doing internal clinical trials on several illnesses and diseases with
> ProAlgaZyme, including various types of cancer, HIV/AIDS, diabetes and
> Chronic Fatigue Syndrome.

26.     As of October 30, 2003, however, HEPI had not completed any "clinical trials" as
the term is generally understood in the scientific community on the effects of ProAlgaZyme on
the body.

27.     In particular, the term "clinical trial" has a specific meaning within the scientific
community, and indicates that the trials are following a certain accepted protocol.

28.     HEPI had not complied with accepted protocols with regard to testing of
ProAlgaZyme as of October 30, 2003.

29.     Rather, HEPI's Director of Medical Research had simply given ProAlgaZyme to
his patients and gathered anecdotal evidence of its purported efficacy. HEPI never disclosed the
informal nature of its purported "clinical trials" to investors.

30.     Additionally, as of October 30, 2003, HEPI had not performed sufficient testing to determine that ProAlgaZyme may increase or activate white blood cells.

31.     HEPI made similarly false representations in a Form 8-K filed with the Commission on December 9, 2003, which Howard Baer signed.

32.     Specifically, HEPI's December 9, 2003 Form 8-K stated:

> Recent clinical trials performed by [HEPI] have indicated that [ProAlgaZyme] may increase and activate white blood cells in individuals whose white cells are low or inactive, in effect enhancing the immune system.

33.     As of December 9, 2003, however, HEPI had not completed any "clinical trials" as the term is generally understood in the scientific community on the effects of ProAlgaZyme on the body, and had not performed sufficient testing to determine whether ProAlgaZyme may increase or activate white blood cells.

34.     In HEPI's Form 10-KSB filed with the Commission for the fiscal year ended December 31, 2003, HEPI again indicated that it had conducted "clinical trials" on ProAlgaZyme.

35.     This statement was false.  As of December 31, 2003, HEPI had not completed any "clinical trials" as the term is generally understood in the scientific community.

36.     Howard Baer signed HEPI's December 31, 2003 Form 10-KSB.

37.     Additionally, Howard Baer certified the December 31, 2003 Form 10-KSB pursuant to Rule 13a-14(a) of the Exchange Act representing, among other things, that the "report does not contain any untrue statement of a material fact."

*HEPI Falsely Announced that Researchers at Arizona State University Concluded that ProAlgaZyme Decreased the Risk of a Stroke or Heart Attack*

38.     Howard Baer, Kevin Baer, and HEPI's Director of Medical Research drafted a press release that HEPI issued on January 20, 2004.

39.     The January 20, 2004 press release announced that:

[A]n independent study conducted by the Biochemistry Department at Arizona
State University concluded that the Company's flagship product, ProAlgaZyme,
possesses fibrinolytic properties, required in the breakdown of pathological fibrin
gel, thus decreasing the risk of a stroke or heart attack.

The January 20, 2004 press release further stated that the ASU study found that ProAlgaZyme

"will neutralize the toxic or free radical-acting soluble fibrins that are released into the body."

This press release then quoted Howard Baer as stating that the ASU study "provides conclusive

evidence of the efficacy of ProAlgaZyme."

40.     This press release contained false statements.  The ASU study did not determine

what health benefits, if any, ProAlgaZyme possessed.  Indeed, according to the ASU scientists

who performed testing to determine if ProAlgaZyme contained fibrinolytic activity *in vitro* (e.g.,

in a test tube), the ASU study was not designed to determine whether ProAlgaZyme had any

specific health benefits *in vivo* (e.g., in a living organism).   The ASU study did not demonstrate

that ProAlgaZyme decreased the risk of a stroke or heart attack, or would neutralize the toxic or

free acting soluble fibrins that are released into the body.

*HEPI Issued A Press Release With Baseless Revenue Projections*

41.     In January 2004, HEPI purportedly purchased the trademarks, licensing, and sales

rights for Zodiac Vitamins and Zodiac Herbal Teas Products.

42.     On January 13, 2004, HEPI issued a press release to announce the Zodiac

Vitamins purchase and to forecast financial results for fiscal year 2004.

43.     Howard Baer, Kevin Baer, and others drafted the press release, and Howard Baer

directed the company to issue the release.

44.     In the January 13 press release, HEPI announced that it had "acquired the

exclusive rights and associated trademarks to all 12 zodiac/astrological signs for both beverage

and supplement use," and quoted Howard Baer as saying that "[w]e also have the potential of generating additional revenue by licensing our trademarks to other companies for relevant product usage."  The press release then indicated that HEPI "[e]xpects revenues for the year of $16 m[illion] or greater" based on anticipated sales of Zodiac Herbal Vitamins, a multivitamin designed for horoscope readers.  Finally, the press release quoted Howard Baer as saying that "[Zodiac Herbal Vitamins] is a very attractive acquisition for us which we expect to be profitable in the first year, based on conservative estimates."

45.     HEPI had no reasonable basis to forecast revenue of $16 million based on anticipated sales of Zodiac Herbal Vitamins.

46.     HEPI had no history of sales of herbal vitamins (or other comparable products) upon which it could base its revenue projection.

47.     Rather, Howard Baer and Kevin Baer, and others, created the $16 million revenue projection simply by assuming that a certain percentage of existing, worldwide horoscope readers would buy Zodiac Herbal Vitamins.

48.     HEPI ultimately decided to abandon the Zodiac Herbal Vitamin and Zodiac Herbal Tea products.

*HEPI Misrepresented the Reasons Why An Independent
Research Company had Stopped Testing on ProAlgaZyme*

49.     HEPI's Form 10-QSB filed with the Commission for the quarter ended March 31, 2005 misrepresented the reasons why an independent research company, which had conducted tests to determine ProAlgaZyme's effects on diabetes, had stopped its testing.

50.     The March 31, 2005 Form 10-QSB indicated that the independent research company had terminated the study because the independent research company "was not able to recruit the specified number of participants (60)."

51.     This statement was false.

52.     In fact, as the lead scientist conducting the study informed Howard Baer, the independent research company had stopped the study because the scientists had not obtained positive results from their tests on ProAlgaZyme, and concluded that further testing would be fruitless.

53.     Howard Baer signed HEPI's Form 10-QSB for the quarter ended March 31, 2005.

54.     Additionally, Howard Baer certified the March 31, 2005 Form 10-QSB pursuant to Rule 13a-14(a) of the Exchange Act representing, among other things, that the "report does not contain any untrue statement of a material fact."

### Howard Baer Executed Trades To Ensure HEPI's Stock Price And Trading Volume Increased

55.     While HEPI was disseminating the misleading press releases described above, Howard Baer (primarily through a brokerage account in his wife's name) executed trades in HEPI stock that were designed to increase the trading volume in HEPI stock and artificially inflate the share price.

*Howard Baer Initiated a Plan to Manipulate the Market for HEPI Stock*

56.     In or around late November 2003, Kevin Baer told a registered representative, or stock broker (the "RR"), in words or substance, that HEPI was retaining a public relations firm to help increase HEPI's stock price to $5 or $6 per share.

57.     In December 2003, Howard Baer sent two e-mails to a Public Relations Firm that HEPI retained.  The first e-mail indicated that "we just need a little buying to kick things off," and the second e-mail asked "[i]s there any chance of any buying in the stock today?"

58.     When his plan to increase the share price was not immediately as successful as he wanted, Howard Baer took more aggressive action.

59.    In a January 22, 2004 e-mail to the Public Relations Firm, which was copied to Kevin Baer, Howard Baer described how he had hired the Public Relations Firm to help with his plan "to finance the company" by causing the price of HEPI stock to reach "$5-6 per share by the first of January" 2004 with a weekly volume of 300,000-400,000 shares.

60.    Specifically, in the January 22, 2004 e-mail to the Public Relations Firm, Howard Baer wrote the following:

> When you and I first spoke, I was very specific in what I wanted done and went to the point in repeating this several times, twice with Kevin [Baer] on the phone, once at the Phoenician... I specifically asked you for daily trading, 10,000 + 'starting immediately' and bringing the stock to $5 or $6 by the first of January. I then wanted major volume, 300 to 400,000 shares done in one week in order to finance the company. I asked you on at least 4 occasions if this was possible, and quite frankly, to my surprise you told me it was and agreed to do it.
>
> When the first announcement from you came out and nothing happened, I made several calls and put some people on [sic] the stock... I was somewhat disappointed, but figured it was your first one so I would give you a little time. After that, for several days, nothing happened. I put in some additional buying and have continued to do that virtually every day. I can account for virtually every trade... There was some selling last week with someone hitting the bids. I bot [sic] 'all' the stock that came in and I have to think part or all of it was from your firm... If you are going to sell, I would think you would go on the offer and put some buying in to take up your shares, not hit the bids and take the stock down... [T]wo weeks into our deal when nothing was happening, Kevin [Baer] contacted and retained another IR firm . . . to get some buying in for us, which they did immediately.
>
> [An RR] has purchased approximately 160,000 shares over the past month. I have personally purchased approximately 18,000 shares... Our Canadian group purchased approximately 11,000 shares. Others that I know about purchased a combined 8,000 plus.
> . . . .
>
> If you had been able to move the shares to $5 or $6 as agreed, and then been able to do 300 to 400,000 in one week also as agreed, we would be financed...
>
> [T]he four top bids on the stock this morning are market makers associated with us. These are all our people with buy orders in.
> . . . .

I need [HEPI stock] to be at a price and will get it there myself if I have to…
[Y]ou and I had a verbal agreement as to what I wanted done.

*Howard Baer and Others Executed Trades in HEPI Stock*

61.     As part of his plan to manipulate the price of HEPI stock, Howard Baer executed numerous trades in HEPI stock, and he enlisted the RR and others to purchase HEPI stock.

62.     After HEPI stock first began trading publicly on October 30, 2003, the RR and his customers began purchasing HEPI stock.

63.     The RR asked Howard Baer whether there were additional HEPI shares available for trading.

64.     Howard Baer then sold shares of HEPI stock held in an account in his wife's name to the RR, the RR's customers, and others.

*Howard Baer Profited From His Sales of HEPI Stock*

65.     Howard Baer's scheme to increase the price of HEPI stock was successful.  From October 2003 through February 2004, HEPI's stock price increased from approximately $.01 per share to $7.54 per share.

66.     During this time period, Howard Baer sold HEPI stock.  For example, from November 26, 2003 through February 17, 2004, Howard Baer (through the account in his wife's name) sold at least 325,700 shares of HEPI stock at prices ranging from $1.85 to $7.12 per share for total proceeds of at least $1,267,386.

67.     Further, between March 3, 2004 and August 15, 2005, Howard Baer (through the account in his wife's name) sold an additional 68,864 shares of HEPI stock at prices ranging from $0.40 to $2.57 for total proceeds of at least $82,206.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act,
### Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Howard Baer)

68.     The Commission repeats and realleges paragraphs 1 through 67 above.

69.     Howard Baer, directly or indirectly, singly or in concert, by use of the means and instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the offer, purchase, or sale of HEPI securities, knowingly or recklessly, has:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or has omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of HEPI securities and upon other persons.

70.     As part, and in furtherance, of the violative conduct, among other things, Howard Baer orchestrated a fraudulent scheme to manipulate the price of HEPI stock.  After obtaining control over HEPI, Howard Baer directed HEPI to disseminate materially misleading public statements about the company and its primary product ProAlgaZyme.  Howard Baer also purchased HEPI stock, and recruited others to purchase HEPI stock to help him increase the price of the stock.  After the stock price had increased, Howard Baer sold HEPI stock at the artificially high price.

71.     Howard Baer knew, or was reckless in not knowing, that his conduct was fraudulent.  For instance, Howard Baer knew, or was reckless in not knowing, that HEPI's January 13, 2004 and January 20, 2004 press releases were materially false and misleading.

72.     By reason of the foregoing, Howard Baer violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Kevin Baer)

73.     The Commission repeats and realleges paragraphs 1 through 67 above.

74.     HEPI, directly or indirectly, singly or in concert, by use of the means and instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of HEPI securities, knowingly or recklessly, has:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact, or has omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of HEPI securities and upon other persons.

75.     HEPI violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by, among other things, disseminating materially misleading press releases, including the January 13, 2004 and January 20, 2004 press releases.

76.     Kevin Baer, who helped draft the January 13, 2004 and January 20, 2004 press releases, substantially assisted HEPI's violations.  For example, Kevin Baer helped formulate the projected revenue from the sales of Zodiac Herbal Vitamins and then helped draft the January 13, 2004 press release.

15

77.     Kevin Baer acted knowingly.  For example, Kevin Baer knew there was no reasonable basis for the revenue projections and that he was acting improperly.

78.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Kevin Baer singly or in concert, directly or indirectly, aided and abetted violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13 (Against Howard Baer)

79.     The Commission repeats and realleges paragraphs 1 through 67 above.

80.     HEPI failed to file with the Commission, in accordance with the Commission's rules and regulations, such annual, quarterly and current reports as the Commission has prescribed, and HEPI failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they are made, not misleading, in violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

81.     As alleged above, HEPI's Form 8-K, filed with the Commission on December 9, 2003 and its Form 10-KSB for the fiscal year ended December 31, 2003 were materially misleading because, among other things, these public filings falsely stated that HEPI performed "clinical trials" on ProAlgaZyme.  Further, HEPI's Form 10-QSB for the quarter ended March 31, 2005 was materially misleading because, among other things, it falsely stated that testing

conducted on ProAlgaZyme by a third party HEPI hired to determine ProAlgaZyme's effects on diabetes, had ceased its testing due to a lack of test subjects.

82.     Howard Baer substantially assisted HEPI's violations by, among other things, authorizing HEPI to file, and signing, these public filings.

83.     Howard Baer knew HEPI was making material misstatements in these public filings, and that his actions were improper.

84.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. §78(t)(e), Howard Baer, singly or in concert, aided and abetted HEPI's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13.

## FOURTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13a-14
### (Against Howard Baer)

85.     The Commission repeats and realleges paragraphs 1 through 67 above.

86.     Rule 13a-14, enacted pursuant to Section 302 of the Sarbanes-Oxley Act, requires the principal executive and financial officers of issuers filing periodic reports with the Commission under Section 13(a) of the Exchange Act to certify, among other things, that they have reviewed the report being filed and the report does not contain any material misstatements or omissions.

87.     Howard Baer signed certifications pursuant to Rule 13a-14 for HEPI's Form 10-KSB for the fiscal year ended December 31, 2003, and for HEPI's Form 10-QSB for the quarter ended March 31, 2005, indicating that the reports did not contain any untrue statement of a material fact.

88.     HEPI's December 31, 2003 Form 10-KSB and March 31, 2005 Form 10-QSB contained material misstatements and omissions.

89.     By reason of the foregoing, Howard Baer violated, and unless enjoined will again violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.


**PRAYER FOR RELIEF**

**WHEREFORE,** the Commission respectfully requests a Final Judgment:

**I.**

Permanently enjoining Howard Baer, and his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 and 13a-14, 17 C.F.R. §§ 240.10b-5 and 240.13a-14, and from aiding and abetting future violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

**II.**

Permanently enjoining Kevin Baer, and his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

**III.**

Ordering Howard Baer to disgorge ill-gotten gains received as a result of the violations alleged above, and to pay prejudgment interest thereon.

**IV.**

Ordering Howard Baer and Kevin Baer to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**V.**

Enjoining Howard Baer and Kevin Baer, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

**VI.**

Enjoining Howard Baer permanently from participating in the offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## VII.

Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        November 20, 2006

Mark K. Schonfeld (MS-2798)
Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
Room 4300
New York, New York 10281
(212) 336-0077 (Gizzi)

Of counsel

Helene Glotzer
Kay L. Lackey
Paul G. Gizzi
Bennett Ellenbogen